Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| L.L., individually and on behalf of J.L. a minor,<br><br>Plaintiff,<br><br>vs.<br><br>ANTHEM BLUE CROSS LIFE and HEALTH INSURANCE COMPANY, DLA PIPER LLP, and the DLA PIPER WELFARE BENEFIT PLAN,<br><br>Defendants. | COMPLAINT<br><br>Case No. 2:22-cv-00208 - CMR |

Plaintiff L.L., individually and on behalf J.L. a minor, through his undersigned counsel, complains and alleges against Defendants Anthem Blue Cross Life and Health Insurance Company ("Anthem"), DLA Piper LLP ("DLA"), and the DLA Piper Welfare Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. L.L. and J.L. are natural persons residing in Santa Clara County, California. L.L. is J.L.'s father.

2. Anthem is an independent licensee of the nationwide Blue Cross Association of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.
3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). L.L. was a participant in the Plan and J.L. was a beneficiary of the Plan at all relevant times.
4. DLA is the designated administer for the Plan.
5. J.L. received medical care and treatment at Wingate Wilderness Therapy ("Wingate") from June 7, 2019, to August 5, 2019. Wingate is a licensed treatment facility located in Kane County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.
6. Anthem, acting in its own capacity or through its subsidiary and affiliate Anthem UM Services, denied claims for payment of J.L.'s medical expenses in connection with her treatment at Wingate.
7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.
8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah, and the treatment at issue took place in Utah.
9. In addition, L.L. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which he will be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and J.L.'s privacy will be preserved.

10. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages pursuant to 29 U.S.C. §1132(c) based on the failure of the agents of DLA as Plan administrator, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Wingate

11. J.L. was admitted to Wingate on June 7, 2019, to address issues related to depression, anxiety, self-harm, suicidality, anger, drug abuse, and school performance.

12. In a letter dated December 21, 2020, Anthem denied payment for J.L.'s treatment under the justification that:

> This treatment is not approvable under the plan clinical criteria because there is no proof or not enough proof it improves health outcomes. For this reason, the request is denied as investigational and not medically necessary. There may be other settings to help you, such as outpatient treatment. You may want to discuss these with your doctor. It may help your doctor to know we reviewed this request using the plan medical policy Wilderness Programs (Med. 00122).

13. On February 24, 2021, L.L. submitted an appeal of the denial of J.L.'s treatment. L.L. reminded Anthem that under ERISA he was entitled to certain protections during the review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers, which took into account all of the information he provided, gave him

the specific reasoning for the adverse determination, referenced the specific plan provision on which the determination was based, and which gave him the information necessary to perfect the claim.

14. L.L. asked that the Anthem reviewer be familiar with outdoor behavioral health programs, be knowledgeable concerning MHPAEA, and also encouraged them to reach out to Dr. Michael Gass, an expert in the outdoor behavioral health field. He also requested all of the documentation related to the decision, including the reviewer's case notes.

15. L.L. contended that the treatment J.L. received was a covered benefit under the terms of the insurance policy. He stated that the exclusions section of the insurance policy did not list outdoor behavioral health programs as an excluded service.

16. He pointed out that the policy did however exclude coverage for experimental or investigational services which it further defined as:

> Experimental procedures are those that are mainly limited to laboratory and/or animal research.

and

> Investigative procedures or medications are those that have progressed to limited use on humans, but which are not widely accepted as proven and effective within the organized medical community.

17. He wrote that outdoor behavioral health programs were not included in these definitions and were accepted as proven and effective within the medical community. He pointed out that Wingate was licensed by the State of Utah and was also accredited by both the Association for Experiential Education and the Outdoor Behavioral Health Council.

18. He contended that outdoor behavioral health care was a necessary and appropriate intervention to treat J.L. and did not qualify as an experimental or investigational service.

He argued that contrary to Anthem's claim, the peer-reviewed literature demonstrated that outdoor behavioral health treatment was proven, safe, and effective.

19. L.L. included some of this peer reviewed literature with his appeal, including a letter from Dr. Michael Gass which directly refuted Anthem's claims that "wilderness programs are considered investigational and not medically necessary." Dr. Gass pointed out that most of the studies cited by Anthem to disprove the efficacy of wilderness programs actually did the opposite and "actually support the use of wilderness therapy in their findings."

20. Dr. Gass noted that some of the studies cited by Anthem examined factors which were largely inapplicable to the treatment J.L. received such as the effects of wilderness programs on individuals suffering from traumatic brain injuries. He wrote that persons afflicted with this condition represented less than 1% of all individuals receiving outdoor behavioral health care. Dr. Gass pointed out that the study had other flaws as well, such as an analysis of the effects of physiological treatment in outdoor behavioral health care when wilderness programs were meant to address behavioral and psychological problems not physical ones such as cancer treatment.

21. L.L. further pointed out that it was inappropriate for Anthem to base its denial on a supplemental wilderness policy as this document stated that it was superseded both by federal and state law as well as the actual terms of the insurance policy which listed no such exclusions.

22. He stated that because J.L.'s treatment at Wingate was provided in accordance with federal and state regulations, was covered by the insurance policy, was not excluded, and

did not meet the definition of an experimental or investigational service, it should not have been denied.

23. L.L. included an independent review decision from Federal Hearings and Appeal Services, Inc. in which the reviewer wrote that outdoor behavioral health programs were proven and effective treatment services, were not experimental, and even had their own revenue code from the National Uniform Billing Committee.

24. L.L. also included another decision by external reviewer Permedion which additionally stated that wilderness treatment was medically necessary and that "[t]here is a significant body of literature establishing its appropriateness… and it is essentially a form of residential treatment level of care."

25. L.L expressed doubt that an organization like Anthem would be unaware of the legitimacy of the outdoor behavioral health level of care. He asked the reviewer to reach out to the National Association of Therapeutic Schools and Programs, or the Outdoor Behavioral Healthcare Research Cooperative if it needed further evidence of the efficacy of wilderness programs.

26. L.L. stated that Anthem's denial appeared to violate MHPAEA. He wrote that MHPAEA compelled insurers to ensure their mental health coverage was offered at parity with comparable medical or surgical services. He identified skilled nursing, inpatient rehabilitation, and hospice facilities as some of the medical or surgical analogues to the treatment J.L. received.

27. L.L. cited to the court decision in *Johnathan Z. v Oxford Health Plans* to support this assertion. He further quoted *Johnathan Z.*'s finding that, "For wilderness therapy, 'excluding mental health treatment merely because it occurs outdoors appears to place a

limitation on mental health' that is different or more restrictive than limitations placed on medical/surgical conditions."

28. He wrote that Anthem was applying nonquantitative treatment limitations which artificially reduced the availability of wilderness treatment by imposing restrictions on this type of care which were not equally applied to analogous medical or surgical services.

29. L.L. stated that one such example was Anthem having a separate policy for wilderness services which was not disclosed in his insurance policy booklet. L.L. wrote that to his knowledge Anthem did not have similar policies in place for services such as skilled nursing care.

30. L.L. additionally wrote that Anthem's denial was a restriction based on facility type, provider specialty, and other criteria. He alleged that Anthem did not categorically deny payment for intermediate level medical or surgical facilities when they were operating in accordance with their licensure and governing state regulations. He stated Anthem was denying wilderness treatment simply because it took place in an outdoor setting while having no comparable limitation for analogous medical or surgical care.

31. L.L. wrote that he was entitled to relief under MHPAEA as he had demonstrated that the Plan was subject to the statute, that it offered both medical and surgical benefits, he had properly identified the medical or surgical analogues to the treatment J.L. received, included skilled nursing, inpatient rehabilitation, and hospice care, and he had demonstrated that Anthem had imposed restrictions on its mental health services which were more restrictive than those applied to these medical and surgical analogues.

32. He requested Anthem perform a parity analysis to ensure the Plan was compliant with MHPAEA and asked to be provided with physical copies of the results of this analysis. In particular he requested to be provided with:

(1) the specific plan language regarding the above limitation and identify all of the medical/surgical and mental health and substance use disorder benefits to which it applies (or does not apply) in the relevant benefit classification;
(2) the factors used in the development of the limitation;
(3) the evidentiary standards used to evaluate the factors;
(4) the methods and analysis used in the development of the above limitation; and
(5) any evidence and documentation to establish that the limitation is applied no more stringently, as written and in operation, to mental health and substance use disorder benefits than to medical and surgical benefits.

33. He wrote that J.L.'s treatment satisfied the definition of medical necessity in the insurance policy and her stay at Wingate was recommended by her treatment team as a way to address her lifelong and chronic behavioral health issues.

34. In the event Anthem maintained the denial, L.L. asked to be provided with a copy of all documents under which the Plan was operated including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria used in the determination as well as their medical or surgical equivalents, whether or not these were used to evaluate the claim, as well as any reports from any physician or other professional regarding the claim, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

35. In a letter dated May 11, 2021, Anthem upheld the denial of payment for J.L.'s treatment. The letter gave the following justification for the denial:

> The services are considered investigational as defined in section titled MEDICAL CARE THAT IS NOT COVERED of your January 1, 2019 DLA PIPER (benefits booklet).

We received a recommendation to uphold the denial from an External Reviewer Medical Doctor (MD), who is board certified and specializes in Psychiatry. Our Anthem Medical Director Reviewer MD, who is board certified and specializes in Psychiatry, denied this request based upon this specialty match review recommendation. Here's why:

We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. The request tells us your provider is asking to continue your treatment through a Wilderness program. This treatment is not approvable under the plan clinical criteria because there is no proof or not enough proof it improves health outcomes. For this reason, the request is denied as investigational and not medically necessary. There may be other settings to help you, such as outpatient treatment. You may want to discuss these with your doctor. It may help your doctor to know we reviewed this request using the plan medical policy Wilderness Programs (Med.00122).

In the appeal letter from Denials Management, they mention that the denial response from Dr. Naimark dated 12/21/2021 stating they did not agree with the adverse determination. [sic] Denials Management also raised concerns regarding Anthem's compliance with ERISA requirements. Dr. Naimark addressed the reasons to deny based on the plan medical policy Wilderness Programs (Med.00122). Denials Management states under ERISA guidelines you are entitled to have a healthcare professional qualified to review your case. We confirmed that Dr. Naimark is board certified in psychiatry. I can also assure you that I am also board certified in psychiatry.

In the appeal correspondence your father and denials management explain that the only definition of experimental procedures are those that are mainly limited to laboratory and/or animal research. They go on to explain that your treatment was not part of any laboratory or animal research.

In this case the denial was based on medical policy for Wilderness Therapy.

You can find our Medical Policies online. Visit www.anthem.com/ca/about/.[1]

Your father and Denials Management also mention in the letter the criteria cited in the denial from Dr. Naimark is not in compliance with the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA). From our understanding, the health plan's determination is not a violation of the Parity Act. We do treat residential treatment centers the same as all intermediate levels of care and we are not holding your residential treatment to a stricter standard. Intermediate care

[1] This link does not take the user to any specific criteria but instead redirects to a generic "About Anthem" page with generic information such as "Careers" and a "Press Room". While Anthem's criteria may be accessible from this page, their location is not readily apparent.

> treatment locations have the goal to move the member to treatment on an outpatient basis. Residential treatment is not meant for long term care.[2]
>
> I have also included additional information regarding your argument related to Nonquantitative Treatment Limitations (NQTLs).
>
> Lastly, your father has made a request for copy of all documents under which the plan is operated, the certificate of coverage, criteria and guidelines used for the benefits you are seeking and all reports from physicians. We are happy to provide this information and will be mailed [sic] under a separate cover.

36. Although the letter stated that all documents under which the Plan was operated would be sent under separate cover, neither DLA nor Anthem ever produced these documents or any of the other materials L.L. requested.

37. The additional information regarding nonquantitative treatment limitations the reviewer stated that they would provide was a short five page packet entitled Mental Health Parity Compliance in Anthem Health Plan Administration. The packet gave a generalized overview of Anthem's policies concerning MHPAEA but did not directly address the concerns L.L. raised concerning non-quantitative treatment limitations or provide any documentation regarding Anthem's self-compliance analysis for MHPAEA.

38. Following this denial of payment, L.L. requested that the denial be evaluated by an external review agency. Along with the external review request, L.L. included a Practical Comprehensive Summary conducted at Wingate by Erin Grover, LCSW, TRS, CTRS, SEP, and a Confidential Psychological Assessment conducted by Todd Corelli Ph.D.

---

[2] L.L. asserted Anthem violated its fiduciary duty in order to protect its financial self-interest. It is telling that while Anthem here describes J.L.'s care as residential treatment and the letter made no mention that any medical necessity analysis was conducted, Anthem still recommended that J.L. be placed in outpatient care. If Anthem's experimental/investigational objection was made in good faith, it presumably would have recommended treatment in a traditional residential treatment center as an alternative to wilderness treatment, given that Anthem's own reviewer described the care J.L. was receiving as residential treatment care in their own words.

39. These assessments recommended that J.L be treated in a therapeutic environment like Wingate in order to best address the treatment of her mental health and substance abuse issues. Dr. Corelli even recommended that J.L. go on to receive additional residential treatment following her stay at Wingate.

40. In a letter dated November 24, 2021, L.L. was informed that the external reviewer had upheld the denial of payment. The reviewer wrote that wilderness programs "continue to be the subject of ongoing research and study" but opined that they were not widely accepted as proven and effective.

41. The reviewer then disclosed that they evaluated J.L.'s non-acute treatment under the mistaken impression that she required an acute level care. The letter stated in pertinent part:

> The documentation provided did not indicate ongoing acute safety concerns that would have necessitated 24 hours a day 7 days a week mental health treatment from 6/7/19 – 8/5/19. This is because there was no documented persistent suicidal or homicidal ideation; although suicidal ideation was listed on the Intake assessment with a report of suicide plan to overdose it was not indicated whether this was recent or past suicidal ideation as the patient had been psychiatrically hospitalized for suicidal ideation in April 2019. There were no psychotic symptoms. The patient did not engage in any recent significant self-injurious behaviors, with her last skin cutting on her shin on "April 10th last time". There is no documentation indicating that she needed to be placed in restraints or seclusion for any physical aggression. She was capable of doing activities of daily living (ADLs). She was medically stable. There were no documented drug withdrawal symptoms, and the patient noted: "Don't plan on using alcohol or drugs again. Don't miss them. Not having cravings". There was no eating disorder. As a result, her treatment did not require the intensity of residential mental health services from 6/7/19-8/5/19, but instead would have been more appropriate for treatment in a less restrictive setting. Continued residential treatment from 6/7/10-8/5/19 would have been primarily custodial in nature, and not medically necessary.

42. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

43. The denial of benefits for J.L.'s treatment was a breach of contract and caused L.L. to incur medical expenses that should have been paid by the Plan in an amount totaling over $33,000.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

44. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

45. Anthem and the Plan failed to provide coverage for J.L.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

46. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiff in the pre-litigation appeal process. 29 U.S.C. §1133(2).

47. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiff's appeals or whether it provided them with the "full and fair review" to which they are entitled. Anthem failed to substantively respond to the issues presented in L.L.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

48. Anthem and the agents of the Plan breached their fiduciary duties to J.L. when they failed

to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.L.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, and to provide a full and fair review of J.L.'s claims.

49. The actions of Anthem and the Plan in failing to provide coverage for J.L.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

50. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

51. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

52. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

53. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location,

facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

54. The medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

55. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for J.L.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

56. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

57. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

58. Anthem and the Plan evaluated J.L.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

59. L.L. identified several examples of conduct by Anthem which he alleged rose to the point of a MHPAEA violation. L.L. alleged that Anthem's denial of treatment based on proprietary wilderness coverage guidelines was one such example. L.L. argued that Anthem did not deny coverage for medical or surgical treatment based primarily on external criteria in the same manner that it had done for J.L.'s treatment at Wingate.

60. L.L. pointed out that Wingate was a licensed facility under Utah law, was accredited by multiple agencies, and was compliant with all governing state regulations. He asserted that Anthem did not categorically exclude analogous medical or surgical services which were licensed under state law.

61. L.L. contended that Anthem's denial constituted a denial based on geographic location and facility type. He provided court decisions, external review decisions, and academic research articles which stated that it was not experimental or investigational. He argued that Anthem had denied payment primarily due to the fact that the treatment J.L. received was provided in an outdoor setting.

62. L.L. pointed out that wilderness programs were widely recognized to the point that they had their own revenue code from the National Uniform Billing Committee ("NUBC"). On information and belief, Anthem categorically excludes coverage for no medical or surgical services that carry a NUBC billing code and which are analogous to the treatment J.L. received.

63. The opinion of the external review agency upholding the denial of payment reveals further disparate application of medical necessity criteria between medical/surgical and mental health treatment.

64. The external reviewer wrote that there were no, "ongoing acute safety concerns" and then provided some examples such as a lack of psychosis, suicidal or homicidal ideations, and behaviors necessitating restraints or seclusion as justifications used for the denial of care.

65. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that J.L. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

66. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

67. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

68. The actions of Anthem and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and

coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

69. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

70. Anthem and the Plan did address in any substantive capacity the Plaintiff's allegations that Anthem and the Plan were not in compliance with MHPAEA. Anthem did make a broad declaration that it was compliant with MHPAEA and "[w]e do treat residential treatment centers the same as all intermediate levels of care and we are not holding your residential treatment to a stricter standard."[3] However, apart from this generic response, Anthem did not address L.L.'s allegations that it had failed to comply with MHPAEA.

71. In fact, despite L.L.'s request that Anthem and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Anthem and the Plan have not provided L.L. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Anthem and the Plan have not provided L.L. with any information about the results of this analysis.

---

[3] Again, this is an admission by Anthem that it considered the wilderness treatment J.L. received as residential treatment, and further supports L.L.'s allegation that Anthem denied payment primarily due to the physical location where the treatment was provided.

72. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

//

//

**THIRD CAUSE OF ACTION**

**(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))**

73. Anthem, acting as agent for DLA, the administrator of the Plan, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and Anthem, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

74. In spite of L.L.'s requests during the appeal process for Anthem to produce the documents under which the Plan was operated, and Anthem's assurance that it would provide these documents under separate cover, Anthem failed to produce to L.L. the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and Anthem, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

75. The failure of DLA and its agent Anthem, to produce the documents under which the Plan was operated, as requested by L.L., within 30 days of his request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

76. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for J.L.'s medically necessary treatment at Wingate under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day after the first 30 days for each instance of DLA and Anthem's failure or refusal to fulfill their duties, to provide the Plaintiff with the documents he requested.

4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 25th day of March, 2022.

By s/ Brian S. King
Brian S. King
Attorney for Plaintiff

County of Plaintiff's Residence:
Santa Clara County, California